J-S20043-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.S., A MINOR | : IN THE SUPERIOR COURT OF |
| | :      PENNSYLVANIA |
| | : |
| APPEAL OF: J.S., FATHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 675 EDA 2026 |

Appeal from the Order Entered December 15, 2025
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s):  CP-48-DP-0000011-2025

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY KING, J.:               **FILED JUNE 30, 2026**

Appellant, J.S. ("Father"), appeals *pro se* from the order entered in the Court of Common Pleas of Northampton County, Orphans' Court, which granted the motion filed by the Northampton County Children, Youth and Families Division ("CYF"), seeking a change in placement for the minor child, J.S. ("Child").  We affirm.

The relevant facts and procedural history of this case are as follows.  Child was born in October 2010.  Child's biological parents are unmarried and reside separately.  Initially, the parents maintained an informal agreement for shared custody.  While Child resided with M.L. ("Mother"), Father exercised periods of partial custody.

On January 26, 2025, law enforcement responded to Mother's home due to a physical altercation between Mother and Child.  (**See** Dependency

Petition, filed 3/5/25, at ¶7(b)).  The next day, CYF received a General Protective Services referral due to Child's "behavioral concerns, governability, Child's alleged substance abuse and Father's substance abuse."  (*Id.* at ¶7(a)).  On March 5, 2025, CYF filed a dependency petition noting that Child tested positive for marijuana three times in a two-week span, and Child had truancy issues at school.  (*Id.* at ¶7(g), (m)).  On March 24, 2025, the court adjudicated Child dependent, but Mother and Father maintained legal and physical custody.  After the entry of the adjudication order, Child began to reside with Father due to Mother's unwillingness to serve as a placement resource.

On August 12, 2025, CYF filed a motion for change in placement arguing that Child continued to display "ungovernable and out of control behaviors." (Motion for Change in Placement, filed 8/12/25, at ¶8).  On August 20, 2025, the court adopted a recommendation from the hearing officer and denied the motion.  Nevertheless, the court's order included a handwritten notation indicating that "Father is to have Child placed at Newport Academy within one week.  If Child is not placed at Newport, [CYF] is directed to file a petition for change of placement."  (Order, filed 8/20/25, at 4).  Father complied with the order and enrolled Child in a rehabilitation program at Newport Academy.

On December 9, 2025, CYF filed another motion for change in placement.  CYF conceded that Father had complied with the prior order by sending Child to Newport Academy.  Nevertheless, Child subsequently

returned to Father's home. CYF alleged that there continued to be a "clear necessity" to remove Child from Father's home because he was unable "to address [Child]'s drug problem or her behavioral issues." (Motion for Change in Placement, filed 12/9/25, at ¶15). CYF detailed the following incident to emphasize its concerns:

> 11. Recently, Father paid for a hotel room for [Child] to celebrate her birthday with her friends. Father did not provide any supervision to the room.
>
> 12. Law enforcement was called two separate times to the hotel room. Upon searching the room an AR-15 gun was found in the room although the police were unable to determine the owner of the firearm.
>
> 13. [Child] and her friends were also breathalyzed by police and [Child] had a reading of 0.08% alcohol blood content.

(*Id.* at ¶¶11-13).

The parties proceeded to a hearing before a hearing officer on December 12, 2025. At that time, CYF presented testimony from the caseworker and the in-home services provider. Father also testified on his own behalf.[1] Following the hearing, the hearing officer recommended that the court grant CYF's motion. (*See* N.T. Hearing, 12/12/25, at 53). On December 15, 2025, the court adopted the hearing officer's recommendation, approved the motion for change in placement, and transferred legal and physical custody of Child to CYF. On January 7, 2026, Father timely filed a *pro se* notice of appeal

_____

[1] The guardian *ad litem* ("GAL") and Child's legal counsel also participated in the hearing.

- 3 -

without a concise statement of matters complained of on appeal. Father filed a *pro se* concise statement on January 12, 2025.

Father now raises four issues on appeal:

Whether the [Orphans' C]ourt erred in ordering removal without clear and convincing evidence that the child was in imminent danger?

Whether the [Orphans' C]ourt failed to consider less restrictive alternatives prior to removal?

Whether the [Orphans' C]ourt violated [Father's] due process rights by relying on insufficient or unreliable evidence?

Whether the [Orphans' C]ourt failed to make adequate findings to support removal?

(Father's Brief at 1).

Father's issues are related, and we address them together. Father contends that CYF presented insufficient evidence to support a change in Child's placement. Father asserts that the Orphans' Court did not "establish that the child was in immediate danger," and the court "did not make adequate findings to support its decision." (*Id.* at 3). Father also argues that the court did not "adequately consider alternatives such as in-home services, supervision, or safety planning prior to ordering removal." (*Id.* at 4). Father concludes that the court abused its discretion by changing Child's placement based upon "unsupported allegations or speculative concerns." (*Id.*) We

disagree.[2]

The following standard of review applies to dependency matters:

> In reviewing an order in a dependency matter, our standard of review requires us "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion."

***Interest of N.B.***, 260 A.3d 236, 245 (Pa.Super. 2021) (quoting ***In re R.J.T.***, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)).

The Juvenile Act controls the adjudication and disposition of dependent children. ***See In re R.P.***, 957 A.2d 1205, 1217 (Pa.Super. 2008). "Following a finding of dependency, the trial court may make an order for the child's disposition pursuant to the Juvenile Act, which is best suited to the safety, protection and physical, mental, and moral welfare of the child." ***Interest of A.C.***, 237 A.3d 553, 564 (Pa.Super. 2020) (internal citations and quotation marks omitted). Regarding the placement of a dependent child, Section 6351 provides in relevant part:

**§ 6351. Disposition of dependent child**

\* \* \*

**(b) Required preplacement findings.—**Prior to entering any order of disposition under subsection (a) that would remove a dependent child from his home, the court

---

[2] In addition to the briefs filed by Father and CYF, the GAL also filed a brief. Significantly, the GAL concluded that the Orphans' Court's order changing Child's placement "is fully supported by the evidence and should be affirmed." (***See*** GAL's Brief at 1).

shall enter findings on the record or in the order of court as follows:

> (1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and

> (2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition[.]

42 Pa.C.S.A. § 6351(b)(1)-(2).

> Under the provisions of the Juvenile Act, … the trial court is given broad discretion in meeting the goal of entering a disposition best suited to the protection and physical, mental, and moral welfare of the child. The trial court's decision to permit a child to either remain with his present caretaker(s), or to temporarily transfer custody to a qualified agency or individual, is subject only to the express limitation that the disposition be in the best interest of the child.

*Interest of A.C., supra* at 565 (internal citations and quotation marks omitted) (emphasis added).

"[P]roper placement turns on what is in the child's best interest, **not on what the parent wants, or which goals the parent has achieved.**" *Interest of La.-Ra. W.*, 266 A.3d 1071, 1090 (Pa.Super. 2021) (emphasis in original).

> A child may be removed from a parent's care only upon a showing of clear necessity; clear necessity exits where the continuation of the child in his home would be contrary to the welfare, safety, or health of the child and reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal.

*Id.* (internal citations and quotation marks omitted).

Instantly, CYF presented testimony from Destiny Blackshear, the family's case worker, in support of the motion for change in placement. Regarding the truancy issue, Ms. Blackshear testified that Child "had about 12 or 13 unlawful absences with a number of tardies" since she returned from Newport Academy on September 18, 2025. (N.T. Hearing, 12/12/25, at 6). Ms. Blackshear also noted that school attendance was part of Child's court-ordered permanency plan. (*Id.* at 5). As far as drug testing, Ms. Blackshear explained:

> [Child] does her urine screens. If she misses it one day, she will go the next day sometimes. They have been negative with trace amounts, but she did have one positive for like her creatine level … which means [Child] basically flushed her system.

(*Id.* at 6). Ms. Blackshear spoke to Child about the results of the drug test, and Child admitted to past attempts at "flushing her system[.]" (*Id.*)

Ms. Blackshear then detailed the events of Child's birthday party.

> In October, for [Child's] birthday, [Father] got a hotel room in his name for her and her friends so that way they can use the pool.
>
> On that night, the police were called twice for noise complaints, and when the police went there, they had [Child] identify herself, and they said that she gave the wrong information about two or three times, and when they searched the room, they found alcohol and an AR-15 in the closet.
>
> And they did also breathalyze the girls, and [Child] came back with a .08. And from that incident, she did receive charges and is pending an intake with probation.

(*Id.* at 7-8).

On cross-examination, the GAL questioned Ms. Blackshear about a prior incident involving Child, her boyfriend, and a firearm:

> [GAL:] You are aware of the fact that [Child] had been involved over the summer with a boyfriend who was involved in a shooting?
>
> [WITNESS:] Yes.
>
> [GAL:] She actually fled with him after he admitted to her that he had shot a couple people?
>
> [WITNESS:] Yes.
>
> [GAL:] Now she turns up at a hotel room with an A[R]-15, I believe.
>
>            *     *     *
>
> [GAL:] So she's five days out of rehab, and she's in a motel room drinking with boys—I don't know if it's the same boyfriend—and there's an assault rifle in the room.
>
> Why was I not notified of that on the 15th when this first happened?
>
> [WITNESS:] We learned of it maybe towards the end of October because [Child] and [Father] did not let me know. I found out because Mom found out from her own source.
>
>            *     *     *

(*Id.* at 17-18).

After considering the testimony, the hearing officer expressed concerns over the trajectory of Child's behavior:

> I'm very concerned here because we have—even after the incident with the bad boyfriend, and the runaway, and

needing rehab and all these things, we still have this kid missing two and a half weeks of school that did not include [the period when Child was at Newport Academy].

I understand [Father has] been driving [Child to school], but she's not going to class; she's not being in school.

We have a very, very serious incident with the birthday party and a very, very bad parenting judgment to take a bunch of teenagers and leave them at a hotel for eight hours.

(*Id.* at 51). Moreover, the hearing officer did not accept an earlier suggestion from the caseworker regarding the possibility of joint custody: "Joint custody is not going to work here. That's the reason we're here in the first place is because joint custody didn't work." (*Id.* at 52).

On this record, the Orphans' Court accepted the hearing officer's finding that CYF had demonstrated the need for a change in placement. (*See* Orphans' Court Opinion, filed 3/4/26, at 5). The court emphasized its concern over Child's participation in the birthday party, which occurred "just **five days**" after Child finished a rehabilitation program. (*Id.* at 4) (emphasis in original). The court concluded that placing Child with CYF was the least restrictive placement that would ensure Child was "in a safe setting that will best suit her needs." (*Id.* at 5).

We agree that CYF demonstrated that remaining in Father's home would be contrary to Child's welfare, and CYF made reasonable efforts to prevent Child's removal from Father's home. *See* 42 Pa.C.S.A. § 6351(b). The case worker's testimony demonstrated that Child had yet to modify her behavior in

- 9 -

accordance with the permanency plan. Additionally, Father's questionable decisions placed Child in situations that did not promote her welfare. Thus, ample evidence supported the court's finding that the change in placement was in Child's best interests. *See Interest of A.C., supra*. Likewise, we agree that CYF demonstrated a clear necessity for the change in placement. *See Interest of La.-Ra. W., supra*. We conclude that the court did not abuse its discretion, and we affirm the order granting the motion for change in placement. *See Interest of N.B., supra*.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/30/2026